

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-18-1996

# United States v. Sriyuth

Precedential or Non-Precedential:

Docket 95-7598

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Sriyuth" (1996). *1996 Decisions*. Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-7598
_____

UNITED STATES OF AMERICA

vs.

NOPPORN SRIYUTH, a/k/a Thi

Nopporn Sriyuth,

Appellant
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 94-cr-00066)
_____

Argued
June 5, 1996
Before:  BECKER and MANSMANN, Circuit Judges,
and SCHWARZER, District Judge.*

(Filed October 18, 1996)
_____

David M. Barasch
United States Attorney
John C. Gurganus, Jr., Esquire (ARGUED)
Office of United States Attorney
309 Federal Building
Scranton, Pennsylvania 18501

  COUNSEL FOR APPELLEE

*        Honorable William W Schwarzer of the United States
District Court for the Northern District of California, sitting
by designation.

James V. Wade, Esquire
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street
Suite 306
Harrisburg, PA  17101

Melinda C. Ghilardi, Esquire (ARGUED)
Office of Federal Public Defender
116 North Washington Avenue
Kane Professional Building
Suite 2C
Scranton, PA  18503

   COUNSEL FOR APPELLANT

_____

OPINION OF THE COURT
_____

MANSMANN,  Circuit Judge.

        Nopporn Sriyuth appeals his conviction of kidnapping
and use of a firearm in relation to the kidnapping in violation
of 18 U.S.C. §§ 1201(a)(1) and 924(c), respectively.  We are
asked to decide, inter alia, whether the district court erred in
failing to exclude evidence, under Federal Rules of Evidence
404(b) and 403, that the purpose or motive for the kidnapping was
for companionship or sexual assault of the victim.

        We find that the sexual assault evidence was probative
of motive as well as the victim's nonconsent to the interstate
transportation and, therefore, was admissible under rule 404(b).
Moreover, given the facts here, the probative value of the sexual
assault evidence outweighed the risk of undue prejudice.
Accordingly, we will affirm.

I.

        At the root of the criminal conduct which occurred here
lies the Laotian custom of arranged marriages.  Nopporn Sriyuth,
also known as "Thi", is a naturalized citizen of the United
States having immigrated to this country from Thailand in 1985.
The victim, Chindavone Phongsavath, whose nickname is "Von," has
resided with her family in Detroit since 1985.  Sriyuth met Von
at her brother-in-law's house while he was in Detroit temporarily
on business in 1990, and they became friends.

        After Sriyuth left Detroit, Von and other members of
her family kept in contact with him either by phone or letter.
Von was not romantically involved with Sriyuth during this time.
Von's mother and sister, however, contacted his mother to discuss
an arranged marriage between Von and Sriyuth.  Von expressed to
Sriyuth as well as to her family her objection to such an
arrangement.

In November 1993, Sriyuth came to Detroit to stay with Von's sister Kethkeo and her husband.  Von, however, was romantically involved with Nala Chanta at that time.  Von's family still felt that Sriyuth was the perfect husband for Von.  They therefore encouraged Sriyuth to take Von away for awhile so she would forget about her boyfriend.  Immediately prior to the kidnap in April 1994, Sriyuth obtained a nine millimeter Taurus handgun from a friend of Von's family.

At approximately 4:30 p.m. on April 5, 1994, Von was visiting her boyfriend Nala Chanta in the bedroom of his residence.  Without knocking and with gun in hand, Sriyuth entered Chanta's residence where he encountered two of Chanta's roommates playing a video game.  Sriyuth inquired as to Von's whereabouts and the roommates informed him that she was upstairs.  Sriyuth proceeded upstairs in search of Von and, upon finding her in Chanta's bedroom, demanded that Von leave with him, grabbed her by the arm, and pulled her out of the room and down the stairs.  When he reached the bottom of the stairs, Sriyuth looked back at Chanta at the top of the stairs, with his gun pointed at him, and said, "I told you not to fuck with me."  Sriyuth then left Chanta's house with Von.

Once outside, Von pleaded with Sriyuth to let her drive home as she did not trust him.  Sriyuth, however, forced her into the driver's side of his car and told her he was taking her home.  When Von refused to move over into the passenger seat, Sriyuth responded, "Move over!  Do you want to die?"  As they drove off, Von told Sriyuth to take her home; Sriyuth instead drove off in a different direction.  Von continued to ask Sriyuth to drive her home.  At one point while Sriyuth was still driving in Michigan, Von tried to get out of the car in order to force Sriyuth to stop.  Sriyuth had to pull into a gas station and Von ran out of the car crying and holding the gun.  Sriyuth ran after her and placed her in a bear hug.  He then apologized and told Von that he was going to take her home and asked her to get back in the car.  Sriyuth escorted Von back to the car.  Von testified that at this point, she believed that Sriyuth was going to take her home.

Sriyuth, however, did not drive towards Von's residence, but told her he was driving to work and that she could take the car and drive home.  Again, Von believed that Sriyuth was telling her the truth.  Shortly thereafter, Von realized they were headed south on the freeway towards Ohio, not in the direction of Sriyuth's place of employment.  She protested, again demanding that Sriyuth take her home.  Von reached over at one point and grabbed the steering wheel, causing the car to swerve.  Sriyuth told her to stop and remarked, "You want to die, you know we can both die together.  I'm not afraid to die."   Eventually, Von realized they had crossed into Ohio when they entered the Ohio Turnpike.

When Sriyuth stopped to get gas at a gas station in Ohio, Von ran from the car and into the bathroom.  After using the facilities, Von remained in the restroom for approximately ten to fifteen minutes.  Eventually, Sriyuth came into the women's restroom looking for her.  He was trying to talk to her

when an employee of the gas station came in and asked him to leave. Sriyuth complied and shortly thereafter, the employee returned to the restroom with the keys to Sriyuth's car and a message from him--that Von could drive. Von took the keys with the understanding that she would be allowed to drive home. After Von stepped outside, however, Sriyuth grabbed the keys from her and carried her back to the car. Although Von considered telling the employee in the restroom what was going on or asking her to call the police, Von decided against it because she still believed at that point she would be allowed to go home and because Sriyuth was a friend of the family.

Sriyuth continued to drive east through Ohio, while Von kept demanding to go home to Detroit. At times Von became very angry and pounded on the dashboard and door to try to get Sriyuth to stop the car. Sriyuth, however, ignored her requests. After he had been driving awhile, Sriyuth pulled off to the side of the road to rest. Sriyuth made several sexual advances towards Von, such as kissing her, forcing her to kiss him back, and trying to remove her pants, all of which Von vigorously rejected. In a final attempt to thwart Sriyuth's advances, Von ran from the car, only to be caught and returned to the car by Sriyuth.

The next morning, now April 6, 1994, Sriyuth arrived in Scranton, Pennsylvania, where he encountered an old acquaintance. After some discussion, Sriyuth and his friend Lem drove separately to the house of a mutual friend located at 615 Court Street in Scranton. After arriving at the Court Street location, Sriyuth and Lem went into the house while Von remained in the car. Five to ten minutes later, the owner of the house, Laksana Sphabmixay came out to the car and asked Von to come in and get something to eat, apparently unaware of how Von came to be with Sriyuth in Scranton. Von finally agreed and went inside the house.

For the most part, Von remained in the living room on the sofa, except to use the bathroom on one occasion. Later that morning, Von asked Sriyuth to give her the keys to the car so she could go to the store to purchase some contact lens solution. Sriyuth refused to give her the keys but later drove her to the pharmacy. Around 2:30 p.m., the owners of the house left to go to work. Sometime in the late afternoon, Sriyuth, accompanied by Laksana's brother, went to two Western Union offices in an attempt to obtain the cash that he thought had been wired to him by Von's sister, Kethkeo. While they were gone, Von telephoned Chanta and her sister, Vila. She gave them the address and phone number of the house in Scranton. Tearfully, she told Vila that Sriyuth had made sexual advances to her. Vila told her she would come and get her, but Von told her to wait because Sriyuth told her he was going to take her home tomorrow.

At some point after Sriyuth returned, Von went upstairs to use the bathroom. Sriyuth went upstairs to see what was taking Von so long. She told him she just wanted to be alone for awhile. He said he was going to play some pool with his friend. Von told him to go, but she was going to stay. She went back into the bathroom and when she emerged ten to fifteen minutes later, Sriyuth was there waiting for her. He blocked her access

to the stairs so she ended up in the bedroom.  She sat down on the floor and wrapped her arms around her legs.  Sriyuth picked her up and placed her on the bed.  Shortly thereafter, Sriyuth became sexually aggressive with Von, ripping her body suit to remove it.  She attempted to fight off Sriyuth's advances by biting, scratching, and pushing him, and by telling him to stop.  Sriyuth ultimately raped her.  Afterwards, Sriyuth told Von to go to sleep and if she tried to move, he would start attacking her again.

Before Sriyuth woke the next morning, Von slipped out of bed and went into the bathroom to take a bath.  Dressed in her jeans and tee-shirt, Von quietly walked downstairs and exited the house.  She walked as fast as she could until she came to a house with a light on.  Von knocked on the door and when two elderly women answered, she asked them if she could use their phone to call the police.  She told them that she had been kidnapped and raped.  The women allowed Von to call the police from their house.  The police arrived a short while later; one of the officers interviewed Von for approximately one hour and then took her to a hospital for a rape examination.  From the hospital, Von was taken to police headquarters in Scranton, where she was interviewed by Special Agent Seidel of the Federal Bureau of Investigation.

Based on the information Von gave to the police officer, officers were dispatched to apprehend Sriyuth.  The officers found Sriyuth in the upstairs bedroom still asleep.  He was taken into custody and transported to police headquarters.  The vehicle driven by Sriyuth from Detroit to Scranton was impounded by the Scranton Police.  After obtaining Von's statement, the police officers were able to obtain a search warrant for the impounded vehicle; the search revealed a nine millimeter handgun in the glove compartment.

Later that day, Agent Seidel interviewed Sriyuth at the Scranton Police Headquarters in the presence of Officer Victor Sanguiliano and Detective Captain Ted Maus.  Prior to any questioning, Agent Seidel read Sriyuth his constitutional rights which he waived.  Sriyuth then proceeded to give a statement to Agent Seidel that essentially mirrors the testimony of Von and the other witnesses.  Prior to trial, Sriyuth filed a motion to suppress this statement.  After a hearing on August 1, 1994, the district court ruled at the Pre-Trial Conference that the defendant intelligently, knowingly, and voluntarily waived his Miranda rights and accordingly denied the motion.

Immediately prior to the commencement of trial, Sriyuth filed a Motion in Limine seeking to preclude the government from introducing any evidence that the purpose or motive for the alleged kidnapping was for a sexual assault.  The district court denied his motion orally at the Pre-Trial Conference on January 30, 1995 without stating a basis for its ruling.  The jury trial began the next day and, at the end of the government's case, defense counsel moved for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The district court denied the motion.  Thereafter, Sriyuth was found guilty on both charges.  Following the jury's verdict, defense counsel

renewed her motion for judgment of acquittal, as well as filed a motion for a new trial, both of which were denied by the district court in a Memorandum and Order dated September 14, 1995.  This appeal followed.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

First and foremost, Sriyuth contends that the district court erred in failing to preclude the government from introducing any evidence at trial that the purpose or motive for the alleged kidnapping was for gaining Von's companionship and for a sexual assault.  Initially, he argues that because motive is not an element of the offense of kidnapping, the sexual assault evidence is not relevant under Federal Rule of Evidence 401.  Alternatively, Sriyuth claims that none of the exceptions to Rule 404(b) of the Federal Rules of Evidence, which precludes the admission of evidence of other crimes, wrongs or acts to prove a person's character, applies here.  Finally, Sriyuth contends that the probative value of this evidence does not outweigh the harmful consequences which would result from its admission and thus should have been excluded under Rule 403 of the Federal Rules of Evidence.

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Relevant evidence will be admissible unless the rules of evidence provide to the contrary.  United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.), cert. denied, 488 U.S. 910 (1988) (citing Huddleston v. United States, 485 U.S. 681, 687 (1988)); see also Fed. R. Evid. 402.  Rule 404(b), although viewed as a rule of inclusion rather than exclusion, provides for the exclusion of relevant evidence in certain situations.  Huddleston, 485 U.S. at 688–89; Scarfo, 850 F.2d at 1019.  Specifically, Rule 404(b) precludes the admission of evidence of other crimes, wrongs or acts to prove a person's character; however, such evidence may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Thus, "[t]he threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character."  Huddleston, 485 U.S. at 686.

Once it has been determined that the other crimes evidence is admissible under Rule 404(b), the balancing test of Rule 403 must also be met.  Accordingly, relevant other crimes evidence may be excluded if the probative value of the evidence is substantially outweighed by the danger of undue prejudice.  Scarfo, 850 F.2d at 1019 (citation omitted).

In order to gauge whether the sexual assault evidence is relevant we must first look to the plain language of the kidnapping statute, 18 U.S.C. § 1201(a).  Section 1201(a) states in pertinent part:

Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or

            carries away and holds for ransom or reward
            or otherwise any person, when:

                  (1) the person is willfully transported
            in interstate or foreign commerce;

            . . .

            shall be punished by imprisonment for any
            term of years or for life.

18 U.S.C. § 1201(a)(1) (emphasis added).  The focus of our
inquiry centers initially on the statutory language that the
victim be held "for ransom, reward or otherwise."
      After examining the legislative history of the 1936
amendment to section 1201 and pertinent Supreme Court cases, the
court of appeals in Gawne v. United States, 409 F.2d 1399, 1402–
03 (9th Cir. 1969), cert. denied, 397 U.S. 943 (1970), concluded
that "obviously `otherwise' comprehends any purpose at all."
(citation omitted).  Because "otherwise" was intended to mean
"any other reason," the court held that defendants' purpose for
the kidnapping was not an element of the offense.  Id. at 1403.
      The government maintains that because "purpose" is an
element of kidnapping and, in order to sustain its burden of
proof as to this element it was required to present evidence of
the sexual assault, purpose was therefore relevant to prove the
offense of kidnapping.  In support of this argument, the
government cites a number of cases which hold generally that
evidence of "some purpose" was sufficient to satisfy the federal
kidnapping statute.  See United States v. Eagle Thunder, 893 F.2d
950, 953 (8th Cir. 1990); (evidence of sexual assault sufficient
to show "some purpose of his own"); United States v. McBryar, 553
F.2d 433 (5th Cir.), cert. denied, 434 U.S. 862 (1977) (evidence
of sexual gratification sufficient to meet "or otherwise"
requirement); United States v. Lutz, 420 F.2d 414, 416 (3d Cir.),
cert. denied, 398 U.S. 911 (1970) (evidence of rape sufficient to
satisfy "or otherwise" element).  In United States v. McCabe, 812
F.2d 1060, 1062 (8th Cir.) cert. denied, 484 U.S. 832 (1987), the
court of appeals stated that "`Congress by the phrase "or
otherwise" intended to include any object of a kidnaping which
the perpetrator might consider of sufficient benefit to himself
to induce him to undertake it.'"  (quoting United States v.
Wolford, 444 F.2d 876, 881 (D.C. Cir. 1971)).
      The district court agreed with the government and held
that the rape was admissible to show motive, citing among other
cases United States v. Bradshaw, 690 F.2d 704, 708 (9th Cir.
1982), cert. denied, 463 U.S. 1210 (1983).  Bradshaw argued that
evidence of his sexual activity with the victim should have been
excluded as irrelevant under Rule 404(b) or, if relevant, was
unduly prejudicial pursuant to Rule 403.  We find the language of
the court of appeals particularly instructive:

            Evidence of drug use and sexual relations
            with a nine-year-old boy was obviously

> prejudicial to the defendant. But it was
> also relevant to show Bradshaw's dominion
> over [the victim]. The contention that the
> victim consented to the trip, and, therefore,
> that he was not kidnapped, made the evidence
> of sex and drug activity occurring after the
> kidnapping admissible. See Holden v. United
> States, 388 F.2d 240, 242 (1st Cir.), cert.
> denied, 393 U.S. 864 (1968).
>
> . . .
>
> Motive is evidence of the commission of any
> crime. This Court has previously held
> evidence of sexual relations admissible
> because of its relevance to motive in a
> kidnapping case. See United States v.
> Gibson, 625 F.2d 887 (9th Cir. 1980). It was
> pointed out in Gibson that while there may be
> no substantial issue of motive under section
> 1201(a), "the subsequent conduct does tend to
> present a picture, the whole of which
> indicates guilt. . . . The picture of a
> kidnapping is not complete unless all of the
> relationships of the defendant to the victim,
> from the beginning of the illegal detention
> to the end of it, are shown." Id. at 888.
> (footnote omitted.)

690 F.2d at 708-09. As in Bradshaw, the evidence of Sriyuth's
sexual assault of Von is relevant to show not only his motive
in kidnapping her, but also that she did not consent to go with
him.

With respect to Sriyuth's Rule 404(b) argument, we
conclude that it must fail for two reasons. First, the evidence
is probative of a material issue other than his character--motive
and the victim's consent--and thus falls within the permissible
uses of other crimes evidence. In addition, "[w]hen the evidence
of another crime is necessary to establish an element of the
offense being tried, there is no `other crime.'" United States
v. Blyden, 964 F.2d 1375, 1378 (3d Cir. 1992). Here the rape
evidence was probative of the victim's lack of consent to the
kidnapping and, therefore, was an element of section 1201(a).
This evidence also explains why Von suddenly decided to report
the kidnapping to the police; without it, her actions in this
case make no sense. The government had no other means available
to it to prove this element. As a result, we conclude the rape
evidence was highly probative of a material element of
kidnapping.

Our analysis does not end here, however, as relevant
evidence will be admissible so long as its probative value
substantially outweighs the danger of unfair prejudice. Fed.
R. Evid. 403; Scarfo, 850 F.2d at 1019. In applying this test,
we must assess the "genuine need for the challenged evidence and

balance that necessity against the risk that the information will influence the jury to convict on improper grounds." Id. (citing United States v. Cook, 538 F.2d 1000, 1003 (3d Cir. 1976); United States v. Driggs, 823 F.2d 52, 54 n. 2 (3d Cir. 1987)). In Cook, we recited several factors to be considered in the balancing process:

> . . . we must balance the actual need for that evidence in view of the contested issues and the other evidence available to the prosecution, and the strength of the evidence in proving the issue, against the danger that the jury will be inflamed by the evidence to decide that because the accused was the perpetrator of the other crimes, he probably committed the crime for which he is on trial as well. . . . The treasured principles underlying the rule against admitting evidence of other crimes should be relaxed only when such evidence is genuinely needed and would be genuinely relevant. (footnote omitted.)

Cook, 538 F.2d at 1003 (quoting United States v. Goodwin, 492 F.2d 1141, 1150 (5th Cir. 1974)). We noted that a significant danger of undue prejudice will be found to exist where there are "substantial possibilities . . . that a jury will harbor strong adverse sensitivity" to the challenged evidence. Id. at 1004. In order to overcome this significant risk of unfair prejudice, the government must prove necessity. Id.

Although Sriyuth contends that "[i]t was likely that the rape evidence contributed to the jury's verdict," we are convinced that this evidence was genuinely needed and relevant to proving the kidnapping. In our view, the rape evidence is strongly probative because it counters two central arguments advanced by Sriyuth. First it rebuts Sriyuth's claim that he transported Von to Pennsylvania with her consent to further the arranged marriage. Evidence that a rape occurred during the kidnapping, even after the predicate elements had been met, made the government's account more likely than without this evidence. Second, the rape evidence refutes Sriyuth's argument that Von's delay in notifying the police showed that she went with Sriyuth willingly. In any event, the risk of unfair prejudice was minimized by the district court's instruction to the jury on the limited use of the sexual assault evidence. As in Driggs, we believe this is a case where the "jury could be expected to compartmentalize the evidence and consider it for its proper purposes." 823 F.2d at 54.

Accordingly, we find that the sexual assault evidence was relevant and that its probative value substantially outweighed the danger of unfair prejudice to Sriyuth. The district court properly allowed the government to present evidence of the motive for the kidnapping.

III.

Sriyuth's other allegations of error need not detain us long as they lack legal merit.

A.

Sriyuth challenges the district court's order denying the suppression of his statement to Agent Seidel. His objection is two-fold: his statement was not made knowingly or intelligently as required by Miranda v. Arizona, 384 U.S. 436 (1966), and his statement was involuntary, having been obtained through the exertion of promises or improper influence by Agent Seidel. We find no merit in either argument.

Our review of the district court's finding that Sriyuth voluntarily, knowingly and intelligently waived his right to counsel is subject to plenary review, but we are required to accept its factual findings unless they are clearly erroneous. United States v. Swint, 15 F.3d 286, 288 (3d Cir. 1994) (citing Arizona v. Fulminante, 499 U.S. 279, 317 (1991)). In determining whether the waiver was voluntary, knowing and intelligent under Miranda, we are required to make a two-pronged inquiry. We must first ask whether the waiver was voluntary "`in" the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986) (citation omitted)). Second, we must inquire whether the waiver was "`made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id.

This inquiry requires us to consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant. Alston v. Redman, 34 F.3d 1237, 1253 (3d Cir. 1994), cert. denied, 115 S. Ct. 1122 (1995) (citing Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983) (additional citations omitted)). Miranda rights will be deemed waived only where the totality of the circumstances "`reveal[s] both an uncoerced choice and the requisite level of comprehension.'" Id. (quoting Moran, 475 U.S. at 421) (citations omitted).

At the suppression hearing, Agent Seidel testified that he was "absolutely certain" that Sriyuth understood him. Agent Seidel stated that, in turn, he did not have any trouble understanding Sriyuth, who spoke English. Indeed, Seidel did not have any concerns whatsoever that there might have been difficulties with communication. Agent Seidel testified that he explained briefly what the victim said occurred and asked Sriyuth if he wanted to talk to him about it. According to Agent Seidel, Sriyuth indicated that he did want to talk to him, at which point Sriyuth was taken to Detective Maus' office where the waiver of rights form was read and explained to him.

Agent Seidel was certain that Sriyuth understood his rights and that he did not wish to have an attorney present for the interview. In response to Agent Seidel telling him that he could have an attorney present, Sriyuth allegedly stated that he

wanted to tell the agent his story, and then, before the hearing, he wished to speak to an attorney. At no point during the interview did the defendant indicate that he wished to stop or that he wanted an attorney present.

Agent Seidel also testified that he did not make any promises to coerce Sriyuth into talking without a lawyer either before or after Sriyuth signed the waiver of rights form. After the interview was over, Agent Seidel told Sriyuth he thought he had done the right thing by telling the truth and, at some point down the road, Seidel would go to bat for him since he had cooperated with the authorities. Detective Maus and Officer Sangiuliano were also present when the waiver of rights form was read and executed, and they corroborated Agent Seidel's account of what transpired.

To the contrary, Sriyuth testified that he immediately requested an attorney, and that before he signed the waiver form, Agent Seidel promised him that he would put in a good word for him with the judge if he cooperated. Sriyuth further stated that he understood his rights as they were read to him. When asked specifically if he understood what "anything you say can be used against you in court" meant, he replied, "Yes, but I didn't really pay attention to that." He stated that he agreed to the interview because he thought that if he got an attorney that day, he would just have to pay a fine and he would be released. Sriyuth also contested the substance of his statement to Agent Seidel as contained in the FBI 302 Report. In particular, Sriyuth denied admitting to Agent Seidel that he kidnapped and raped Von.

According to Agent Seidel, at the time of the interview the defendant did not appear to be under the influence of alcohol or drugs, nor did he appear to be mentally or physically disabled in any way. At the suppression hearing, Sriyuth testified that he was twenty-three years old, had been in this country for nine years, and had attended high school in the United States for five years. Since quitting school, Sriyuth managed a fast food restaurant and worked in construction; at the time he was arrested he was working for a grinding company. Sriyuth also testified that he was not familiar with the criminal justice system. He did, however, state that he knew he was entitled to a lawyer upon arrest from watching movies and the television show, "The People's Court." Sriyuth was not handcuffed during the interview, which lasted approximately one hour.

The district court found that Sriyuth's testimony at the suppression hearing was not believable. By crediting Agent Seidel's testimony, the district court in effect adopted the agent's version of the facts--that Sriyuth understood his rights, based on the number of years he has lived in the United States, his education and work experience; that Sriyuth did not request an attorney for the interview; and that Agent Seidel did not promise Sriyuth that he would put in a good word for him to coerce him into waiving his rights. These findings are not clearly erroneous. The record supports the denial of the motion because Sriyuth waived his rights freely and deliberately, and was not coerced into relinquishing them. Moreover, his own

testimony confirms that he understood the nature of the right being abandoned and the consequences of such abandonment. We hold, therefore, that the district court did not err in concluding that Sriyuth voluntarily, knowingly, and intelligently waived his right to counsel. Accordingly, the district court properly denied the motion to suppress.

B.

Sriyuth also contends that there was insufficient evidence for the jury to find that he held the victim against her will at the time he transported her across state lines. Challenges to the sufficiency of the evidence are reviewed "to determine `whether, viewing the evidence in a light most favorable to the government, there was substantial evidence upon which a reasonable jury could have based its verdict.'" United States v. Console, 13 F.3d 641, 652 (3d Cir. 1993), cert. denied, 114 S. Ct. 1660 (1994) (quoting United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990), cert. denied, 500 U.S. 915 (1991)). We find no merit in this argument. It is clear from our review of the evidence that the government presented substantial evidence from which the jury could believe the victim did not consent to be transported across state lines.

C.

The last two issues concern the district court's instructions to the jury. The first objection involves the following charge:

> The crime of kidnapping is complete when the
> defendant willfully transports a person
> against her will, and the person does, in
> fact, cross state lines. The offense of
> kidnapping is complete, then any agreement by
> the person to continue detention by the
> defendant does not absolve the defendant of
> the criminal responsibility.

Sriyuth contends the jury charge incorrectly defined the offense of kidnapping, and, as a result, the jury failed to consider whether the victim was a consenting party at the time they crossed state lines. We have held that if the jury charge "`fairly and adequately submits the issues in the case to the jury [without confusing or misleading the jurors]'", then when viewed as a whole and in the light of the evidence, the court's instruction will not constitute reversible error. United States v. Simon, 995 F.2d 1236, 1243 n.11 (3d Cir. 1993) (citations omitted); see also United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995). Here, upon review of all of the instructions, it is clear that the district court fairly and adequately instructed the jury on the elements of the offense of kidnapping. In particular, the court correctly instructed the jury that it must find beyond a reasonable doubt that the victim was being transported unwillingly at the time she crossed into Ohio. We find nothing in this instruction which would have confused or misled the jury.

The final objection involves the supplemental jury instruction given in response to a note received from the jury. After discussion with counsel outside the presence of the jury, the district court responded by giving the jury a written copy of his oral instruction on the elements of kidnapping. Sriyuth objected to the fact that it was given in writing, but had no problem with the substance of the supplemental charge if reread to the jury.

In Beardshall v. Minuteman Press International, Inc., 664 F.2d 23, 28 (3d Cir. 1981), we recognized that "the form and extent of supplemental instructions are within the sound discretion of the court." There, the trial court submitted a written statement to the jury outlining the "bare bones" elements of fraud, instead of the original oral instruction which amplified the requirements for each element, including the relevant qualifications and distinctions of each. We disapproved of the trial court's written instruction in Beardshall because it did not contain the qualifying instructions or the explanations of the original oral charge, and thus unduly emphasized the plaintiffs' theory of the case. Id. We did not preclude the use of written instructions, however, in the appropriate case, although we noted that the practice had risks. In order to "avoid prejudicial emphasis on part of the case," we noted the trial court should "[remind] the jury of the other aspects of the original charge and [caution] them that the segment of the charge which is amplified or explained should be considered in the light of the other instructions and is not to be given undue weight." Id. at 29. We are in agreement with the statement of our sister Court of Appeals for the Fifth Circuit in United States v. Ehrlich, 902 F.2d 327 (5th Cir. 1990), cert. denied, 498 U.S. 1069 (1991), that where initially the jury is charged orally but is later given written instructions in response to a request for supplemental instructions, "there [will be] no error unless, under the totality of the circumstances, the court's written response creates an unbalanced charge prejudicial to the defendant." Id. at 330 (citation omitted).

Here we cannot say, under the totality of the circumstances, that the district court's written instruction created an unbalanced charge prejudicial to Sriyuth. Unlike Beardshall, the district court submitted the entire jury instruction as originally given on the elements of kidnapping. Thus, there was no need to remind the jury of the other aspects of the original charge. Although we note that the district court acknowledged the better practice may have been to read the supplemental instruction to the jury instead of submitting a written charge, we cannot say the court's choice resulted in placing undue emphasis on any aspect of the case.

VI.

We find that the district court did not err in allowing the government to present the sexual assault evidence at trial or in denying the motion to suppress the defendant's statement to Agent Seidel. We further hold that the government presented substantial evidence from which a reasonable jury could conclude

the victim did not consent to be transported across state lines. Finally, we conclude that the district court acted within its sound discretion with regard to the challenged jury instructions. Accordingly, we will affirm the judgment in this criminal case.