Rosa M. BOURGER, Plaintiff,

v.

EATON CORPORATION, Defendant.

No. CIV.1:98CV266.

United States District Court,
W.D. North Carolina,
Asheville Division.

April 7, 2000.

Rosa M. Bourger, Hendersonville, NC, pro se.

John J. Doyle, Jr., Jill S. Cox, Constangy, Brooks & Smith, Winston–Salem, NC, for Eaton Corporation, defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

THIS MATTER is before the Court on the Plaintiff's timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendant's motion for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the recommendation is adopted. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72.

### I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Ze-*nith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### II. FINDINGS OF FACT

Plaintiff, who appears in the action *pro se,* alleges one cause of action against her former employer for retaliatory treatment in violation of 42 U.S.C. §§ 2000, *et. seq.* Complaint, filed December 21, 1998. Plaintiff worked as an electrical assembler at the Defendant's plant in Arden, North Carolina, from January 1990 through July 1998. Deposition of Rosa Bourger, *attached to* Defendant's Motion for Summary Judgment, at 56–59. At her deposition, Plaintiff acknowledged that as far back as 1993 she had experienced problems working with others. *Id.,* at 76–84. She also admitted that sometimes co-workers became upset with her when she corrected their work habits. *Id.* During her deposition, Plaintiff identified numerous individuals with whom she had confrontations, many of which involved management. *Id.,* at 76–113, 129, 146. These confrontations were not limited to white co-workers. *Id.,* at 129–30, 131–32. On one occasion in 1995, she was sent home without pay after an incident involving a African co-worker whom she told to "shut up." *Id.,* at 133. The Plaintiff felt that she was "blackballed and [ ] threatened. My job was threatened, you know, by the conversation that I had had with Emmanuel out there." *Id.,* at 135. Not long afterward, she told her supervisor that he owed her an apology because he questioned her about having food at her work station. *Id.,* at 138, 143. Two other incidents involved co-workers who borrowed tools from her work station. *Id.,* at 76–79, 147. On another occasion in 1995, when asked to share in a potluck dinner, she replied that she did not eat leftover food prepared by other people. *Id.,* at 150. Plaintiff acknowledged that in August 1995 she was disciplined for refusing to stop work to listen to a supervisor. *Id.,* at 158, 161. On another occasion, she yelled at a supervisor for the manner in which he addressed her. *Id.,* at 162. Plaintiff openly

admitted that her co-workers watched her and "squealed" on her for doing her job in the manner she felt was best, not necessarily the prescribed method. *Id.,* at 162–165.

In 1995, Plaintiff was sent for counseling through the Employee Assistance Program (EAP). *Id.,* at 169. However, she told the counselor to "[m]ake this a note. I will not be coming back here ever again to talk to you about anything. I don't need to come." *Id.,* at 170. At this time, Eaton had a policy of requiring an employee to take a drug test if he or she engaged in a confrontation with a superior. *Id.,* at 171. After another confrontation with a supervisor, Plaintiff was required to take a drug test. However, Plaintiff had another drug test performed by her own doctor because she felt her supervisors might falsify the test results. *Id.,* at 171–72. Plaintiff testified that many employees were required to take drug tests. *Id.,* at 174.

In 1997, Plaintiff was accused by a co-worker of stalking him. *Id.,* at 204. She denied the accusation. However, at her deposition, Plaintiff testified that the accusation of stalking was "the reason why I finally lost my job." *Id.,* at 206. In July 1998, Plaintiff was terminated after an incident in which her co-workers accused her of trying to supervise them. *Id.,* at 223–24. Plaintiff testified that one of those co-workers said Plaintiff was "just old and lonely and crazy." *Id.,* at 223. During a meeting with those co-workers, Plaintiff accused one of being a liar. *Id.,* at 225. At the end of that meeting, Plaintiff was told she was terminated. *Id.,* at 226. When she asked why she was being terminated, she was told she was a troublemaker. *Id.,* at 227. Nonetheless, the company allowed the Plaintiff to retire instead of terminating her. *Id.,* at 230.

The Plaintiff recalled on one occasion in 1994 that a co-worker referred to her as "Aunt Jemima." *Id.,* at 255. That employee was transferred from that department as a result of the incident. *Id.,* at 258.

Defendant attached copies of the Plaintiff's personnel records to its motion for summary judgment. Those records show that beginning in late 1994 Plaintiff had problems on a monthly basis involving her ability to deal with co-workers. She repeatedly complained that one co-worker or another was not speaking to her and that her co-workers gossiped about her. Exhibit 5, *attached to* Affidavit of Steven Sheppard, at 6. As early as May 1995, Plaintiff told supervisors that she planned to sue the company, had retained an attorney and was making notes of all incidents. *Id.,* at 7. This was repeated later in the year. *Id.,* at 33–34. At least two co-workers expressed fear of the Plaintiff in 1995. *Id.,* at 8–9. On more than one occasion, Plaintiff believed a co-worker had been romantically interested in her and accused other co-workers of turning the individual against her. *Id.,* at 12–13. Her records show she had weekly, if not more frequently, meetings with supervisors to discuss her concerns and problems. *Id.,* at 1–13. These meetings were often to discuss her belief of a conspiracy against her. *Id.* Despite the personal attention received, Plaintiff began a pattern of breaking rules, particularly regarding safety issues. *Id.,* at 15. She also continued a pattern of being late to work. *Id.,* at 15–21.

The records reiterate the Plaintiff's testimony about various incidents with co-workers. She had two altercations with an African male who had immigrated to the United States and blamed those incidents on the cultural differences between Africans and Americans, noting African men are rude and disrespectful of women. *Id.,* at 21–24. More than one co-worker reported that the Plaintiff used obscenities or swore at them. *Id.,* at 25. After having an altercation with a co-worker, she would take notes about that worker's work performance in order to intimidate them. *Id.,* at 26. Many workers complained that she kept the department in constant turmoil and made it difficult to work. *Id.* When she became angry with her supervi-

sor, Plaintiff would refuse to speak to him or her, again causing work disruption. *Id.,* at 26–30. On one occasion, she yelled at her supervisor, "You are my enemy." *Id.,* at 30. As a result of continued problems both with co-workers and her supervisor, the Plaintiff was referred to the EAP in late August 1995. *Id.,* at 40. When an employee is referred to the EAP, corporate policy requires that a drug test be taken. *Id.,* When Plaintiff's supervisor escorted her to the nurse's office for the test, the Plaintiff became hostile and angry and again yelled at her supervisor, threatening a lawsuit. *Id.* At one point, the Plaintiff turned her back to the supervisor, grabbed her buttocks and spread her cheeks apart while telling the supervisor to document that gesture. *Id.,* at 41.

After the referral to EAP, the Plaintiff and several supervisors had monthly meetings to follow her progress. *Id.,* at 41–56. After one of those meetings, the Plaintiff commented to her supervisor, "I can see why employees bring guns into a company." *Id.,* at 56. When her supervisor replied in shock, Plaintiff repeated the statement twice, once while smiling. *Id.* Inexplicably, after this incident the Plaintiff's performance and ability to deal with co-workers improved remarkably and her supervisor gave her full credit for the improvements. *Id.,* at 57–58. However, by January 1997, Plaintiff was again embroiled in a confrontation with co-worker, the African male with whom she had previously had problems. *Id.,* at 61–66. This confrontation led to a one day suspension for both employees. In the fall of 1997, an African American male co-worker reported the Plaintiff had been stalking him. The Plaintiff's conduct deteriorated thereafter and in March 1998, she commented to a supervisor that she hated all white people. *Id.,* at 71. She told the same supervisor that she wanted to "blow off the head" of a co-worker. *Id.,* at 72. Another supervisor reported that the Plaintiff followed a co-worker whom she did not like and stared at the African co-worker with whom she

had confronted. *Id.,* at 73. She also began her old habit of refusing to respond to supervisors' questions. *Id.,* at 74. In July 1998, Human Resources employees conducted a meeting among Plaintiff and four of her co-workers, three of whom are African American. These co-workers reiterated complaints of being stalked and monitored by the Plaintiff who used obscene language frequently. *Id.,* at 74–78. Plaintiff's continuing difficulties with her co-workers finally resulted in the decision to retire her. *Id.,* at 74–76.

In response to the motion for summary judgment, Plaintiff filed an affidavit in which she averred that her difficulties at Eaton began when she married a Caucasian man which caused female co-workers to become jealous. Affidavit of Rosa Bourger, filed January 21, 2000. She also felt those workers were jealous of the attention she received from male co-workers because she dressed well and looked attractive at work. *Id.* The Plaintiff refutes the allegations in the Sheppard Affidavit and listed the names of co-workers with whom she had a good rapport. *Id.* She also lists numerous Caucasian co-workers with whom she claims she had friendly relationships. *Id.* In addition, she argues that her supervisor must have fabricated these incidents because otherwise, Eaton would not have kept her employed for eight years. *Id.*

Plaintiff alleges that Jon Corbin, a co-worker who had been friendly, was promoted into a supervisory position so that he could spy on her and provide information to her immediate supervisor. *Id.* The comment reported by Corbin that Plaintiff said she hated the white race is refuted by the Plaintiff who reiterates she is married to a Caucasian and states her only friends in North Carolina are Caucasian, "numbering more than two hundred fifty (250), the best of friends."[1] *Id.,* at 19. Plaintiff believes all her employment problems were caused by her immediate supervisor, Denise Hulslander, whom she claims has

---

1. Plaintiff later refers to her divorce, apparently from this man.

"stopped many faces from smiling. She stopped employees for having better work relations. Plaintiff feels so sad for her and her followers. Plaintiff does know for sure that God takes care of his own." *Id.*, at 20. "Does she hate plaintiff because of age, skin color, intelligence, integrity, and manner of dress, ease of accomplishing tasks, honesty, or marriage to a white man?" *Id.*, at 28.

Plaintiff also addressed the allegations that she had stalked Nate Bowman, an African American co-worker. Plaintiff believes a female African American co-worker prompted Bowman to make these accusations after the two co-workers began dating. *Id.*, at 21–22. Plaintiff claims she had earlier rejected Bowman's advances made after they went to his home one evening after a party. *Id.*, at 36, 47. Bowman placed a video in his television for them to watch. *Id.*, at 47. "What did I see? Naked black people making love! It shocked me." *Id.* The Plaintiff left but claims her rejection of Bowman led to his accusations of stalking when, in fact, he had previously stalked her. *Id.*

### III. DISCUSSION

 Plaintiff alleges that she was discriminated against because of her race and that she was retaliated against because she spoke against such discrimination.[2] In order to show a *prima facie* case of racial discrimination, Plaintiff must show: " '(1) that she is a member of a protected class; (2) she was qualified for her job *and her job performance was satisfactory;* (3) that, in spite of her qualifications and performance, she was fired; and (4) that the position remained open to similarly qualified applicants after her dismissal.' " *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir.1998) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir.1989)) (emphasis added). Plaintiff cannot show that her job performance was satisfactory.

From 1994 until her termination in 1998, Plaintiff had a series of serious difficulties involving her ability to work with others. Her behavior was disruptive, instigative and on several occasions, threatening. To refute the overwhelming evidence against her, Plaintiff insists on a conspiracy against her by co-worker, supervisors and Human Resource personnel. This claim flies in the face of her continual difficulties with co-workers and superiors. She corrected or "tattled" on co-workers and was insubordinate to supervisors. She told an EAP counselor that she would never talk with him again and did not need his services. She made an obscene gesture to her supervisor in the presence of another person. Despite Plaintiff's repeated threats to her supervisors of lawsuits, no retaliation was taken against her. She made comments such as "I can see why employees bring guns to work," and "I would like to blow off the head" of a co-worker. Her need for attention and complaints about co-workers kept her supervisors constantly in meetings. Nor has the Plaintiff presented any evidence of racial animus with the exception of an allegation that she was called "Aunt Jemima" by an employee who was promptly transferred to another department as a result. Indeed, the only mention of race throughout her employment is the Plaintiff's own persistent references to race: the race of her husband, the cultural differences between Africans and Americans, the race of people on a video and her dislike of the "white race." Her two biggest problems were with two men who were of her own race. Plaintiff "presents no evidence that any other employee had nearly the same problems as she did across the board.... In short, the evidence that [Plaintiff's] job performance was unsatisfactory is overwhelming." *Id.* Because her performance was unsatisfactory, no discriminatory intent on the part of Eaton may be inferred.

---

2. In the response to the motion for summary judgment, Plaintiff refers to age discrimination. However, that was not the subject of her complaint filed with the Equal Employ-

ment Opportunity Commission and therefore may not be raised herein. *Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147 (4th Cir. 1999).

*Id.* Thus, Plaintiff has failed to make a *prima facie* case of discrimination.

▆▆▆ In order to make out a *prima facie* case of retaliation, a plaintiff must show that "(1) she engaged in protected activity, (2) the employer took adverse action, and (3) there was a causal connection between the two." *Id.* The record does not support the Plaintiff's allegations that she engaged in protected activity. However,

> [a]ssuming *arguendo* that [Plaintiff] has made a prima facie case of [retaliation], "the burden of production shifts to [Eaton] to articulate some legitimate, non-discriminatory reason" for its action. Once [Eaton] meets this burden, [Plaintiff] must prove that [Eaton's] proffered reason was mere pretext and that race was the real reason for her termination. To avoid judgment as a matter of law on this question, [Plaintiff] must establish a "legally sufficient evidentiary basis for a reasonable jury to find for [her]."

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278, 281 n. 1 (4th Cir.2000) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) and Fed.R.Civ.P. 50(a)) (other citations omitted) (applying this framework to claims of retaliation.). Eaton has proffered as the reason for Plaintiff's termination her inability to work with others. Plaintiff claims the real reason for her termination was a conspiracy among co-workers, her supervisors and others against her. She articulates no racial motivation to that conspiracy except broad, general speculation. She has attached to her affidavit purported statements from co-workers in support of her claim that she performed well. The inability to work with others is clearly a valid reason for job termination. *Id.*, at 280. Plaintiff's performance appraisals,

> along with other evidence introduced by [Plaintiff], shows quite strongly that [Plaintiff's supervisors were] dissatisfied with [her] performance. But instead of producing evidence that shows [this] assessment of her performance was dis-

honest or not the real reason for her termination—as the law requires—[Plaintiffs] disputes the merits of [the performance] evaluations.... She argues that she performed well in her job and offers evidence in an effort to support this contention, including [ ] memoranda written by [Plaintiff] herself and statements allegedly made by her co-workers. In doing so, [Plaintiff] can prove only the unremarkable fact that she and [her supervisors] disagreed about the quality of her work. But we have repeatedly held that in a [retaliatory] discharge action " '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.' " The alleged opinions of [Plaintiffs] co-workers as to the quality of her work are similarly " 'close to irrelevant.' " In short, we do not sit to appraise [the supervisors'] appraisal[s]. Rather, "[o]ur sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." [Plaintiff's] extensive efforts to rebut [the] assessment of her performance simply do not provide a legally sufficient basis for this conclusion.

*Id.* (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) and *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991))). "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.' " *Id.*, at 279 (quoting *DeJarnette, supra* ). Finally, the death knell to Plaintiff's claim is her own testimony during her deposition that she "finally" lost her job because the allegations of stalking. She attributed no racial animus to Eaton; she made no claims that her termination was in retaliation for protected activity. The Defendant's motion should therefore be granted.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the Plaintiff's motions for summary judgment are hereby **DENIED** as untimely; and

**IT IS FURTHER ORDERED** that the Plaintiff's motion to continue and Defendant's motion to strike are hereby **DENIED** as moot.

A Judgment dismissing this matter on the merits in its entirety is filed herewith.

### *JUDGMENT*

For the reasons stated in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendant's motion for summary judgment is **ALLOWED**, and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.

### MEMORANDUM AND RECOMMENDATION

COGBURN, United States States Magistrate Judge.

THIS MATTER is before the court upon defendant's Motion for Summary Judgment. Having carefully considered that motion and reviewed the pleadings, the undersigned enters the following findings, conclusions, and recommendation.

### FINDINGS AND CONCLUSIONS

#### I. Procedural Background

On December 21, 1998, plaintiff filed her complaint, which appears to have been prepared by an attorney. Since that time, no attorney has made an appearance on her behalf, and the court has considered plaintiff as proceeding *pro se*. On December 13, 1999, defendant filed its Motion for Summary Judgment. On December 21, 1999, this court allowed plaintiff's Motion for Extension of Time and advised her in accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), that she carried a heavy burden in responding to defendant's

motion, instructed her as to how to write an affidavit, and allowed her up to and inclusive of January 21, 2000, to file her response. On January 21, 2000, plaintiff filed her 78–page affidavit, to which she attached exhibits. Defendant has timely filed its reply to plaintiff's response, and this matter is now ripe for decision.

#### II. Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Anderson, supra.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

[T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

### III. Factual Background

In this action, plaintiff contends that defendant terminated her employment in retaliation for her complaints opposing racial discrimination in the workplace in violation of Title VII of the Civil Rights Act of 1964—42 U.S.C. §§ 2000e, *et seq.* The following facts are from the undisputed evidentiary material submitted; where a conflict exists, such fact has been drawn in plaintiff's favor.

Plaintiff is a black female. She began her work with defendant on January 29, 1990, at its Heywood Road facility in Arden, North Carolina, where she worked as an electrical assembler. Her employment was terminated on July 24, 1998, for her having instigated interpersonal conflicts with her coworkers, both black and white, which defendant determined caused significant disruptions in the workplace. At pages 2 through 11 of its brief (incorporated herein by reference), defendant has summarized, documented, and referenced plaintiff's numerous on-the-job outbursts, harassments of other workers, and communications of threats to supervisors during her eight-year tenure. In her affidavit, plaintiff disputes who caused those incidents. She, however, does not dispute that complaints were filed against her by coworkers of different races; supervisors counseled her; she communicated implicit threats of armed workplace violence; defendant provided her with an Employee Assistance Program; or that defendant attempted to resolve her problems by moving her to a different assembly line, where the same problems developed with new coworkers. Plaintiff would take notes as to the activities of fellow workers, follow them to the bathroom, refuse to talk with them, use profanity, communicate threats, and point heat guns at them.

During several disciplinary encounters with her white female supervisor, plaintiff accused her of harassment and stated, "I am a black woman, and white people listen to each other, and not to a black woman." *Sheppard Aff.,* at ¶ 12, Ex. 5, p. 67. She also stated that the complaints of her fellow employees were based upon her race. *Id.*

With this history, the final incidents are the ones which are asserted as the bases for plaintiff's termination. Having been transferred to a new line in early 1997, plaintiff again was the subject of complaints from coworkers when fellow black employees complained about plaintiff's on-the-job behavior. In September 1997, a black male employee complained that plaintiff was stalking him in the workplace. Plaintiff's new supervisor, Charles Hill, along with the Human Resources Manager, Stephen Sheppard, met with plaintiff concerning that complaint. Upon investigation, Sheppard determined that complaint was consistent with earlier complaints from other coworkers concerning plaintiff's stalking them and taking notes of their activities at work. On September 22, 1997, Sheppard met with plaintiff and warned her that if she continued to cause problems with her coworkers, her employment would be terminated. On July 24, 1998, Hill informed plaintiff that her own allegations of misconduct by fellow employees were unfounded and that she had again engaged in earlier prohibited activities, including stalking, monitoring the work of fellow workers, and calling them

names. When Hill confronted plaintiff, he had called her, along with four coworkers (three black and one white), into a conference room. The gathering quickly degenerated into a shouting match, and Hill enlisted Sheppard to resolve the conflict. In response to the allegations leveled by these coworkers, plaintiff screamed that they were all "liars." Sheppard testified that he determined that plaintiff had once again instigated interpersonal conflict with her coworkers, called plaintiff into his office, and terminated her employment. At that time, he told her that her employment was terminated based upon her instigation of conflicts with fellow workers, but that he would treat her involuntary termination as retirement since she was then eligible for such benefits.

## IV. Plaintiff's Claim for Retaliation for Opposing Discrimination

### A. Introduction

In *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253 (4th Cir.1998), plaintiff therein asserted a claim under the opposition clause of Title VII. The *Laughlin* court held:

> Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities. To determine whether an employee has engaged in legitimate opposition activity we employ a balancing test. We " 'balance the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.' "

*Id.*, 258 (citations omitted). In this case, it is plaintiff's contention that she was terminated based upon opposition she voiced to her supervisor in 1995 and 1997, which was more than 18 months prior to her termination.

### B. Establishing a *Prima Facie* Case

A plaintiff may establish a case of retaliation for opposing racial discrimination through use of a *"McDonnell Douglas* scheme." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991). To make out a *prima facie* case of oppositional retaliation, plaintiff would have to show the following:

(1) she engaged in protected activity;

(2) she was subjected to an adverse employment action; and

(3) that a causal relationship exists between the first two elements.

If a plaintiff can establish such a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon such a showing by the employer, the burden would then shift back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext for retaliation. *Id.* To make such showing, the plaintiff must prove that "but for" the protected conduct, the adverse employment action would not have occurred.

### C. The *Prima Facie* Case

Defendant concedes for the purposes of argument that plaintiff complained to the company in August 19995 and January 1997 about race discrimination she perceived and that she was subjected to an adverse employment action in July 1998. Plaintiff, therefore, has satisfied the first two elements of a *prima facie* case.

Plaintiff, however, has presented no evidence of any causal link between the first two elements that would satisfy the third element of a *prima facie* case. Close temporal proximity between the first elements has been held to satisfy the third element. *See Carter v. Ball,* 33 F.3d 450 (4th Cir. 1994) (five months); *Williams v. Cerberon-*

*ics, Inc.,* 871 F.2d 452 (4th Cir.1989) (four months). Likewise, distant temporal proximity may indicate no retaliatory motivation. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739 (11th Cir.1996). In this case, 18 months had passed between plaintiff's last alleged oppositional comments and her termination. The undersigned cannot find that such period would amount to close temporal proximity contemplated by the appellate court in *Carter.* Indeed, the Court of Appeals for the Fourth Circuit has found that causation could not be proved where 24 months had passed. *Heyward v. Monroe,* 166 F.3d 332, 1998 WL 841494, 1998 U.S.App. Lexis 30855 (4th Cir. Dec. 7, 1998).

The undersigned has also searched the record for any other-than-temporal causal connection between plaintiff's oppositional activity and her termination. Notably, plaintiff's alleged opposition to racial discrimination was only in *response* to disciplinary action already taken by defendant. Even though plaintiff had communicated threats of physical violence against specific coworkers, implicitly threatened to bring a gun into the workplace, and challenged her direct supervisor with vulgarities, the painstaking care which defendant and its supervisory employees took is antithetical to plaintiff's claim. When personal counseling failed, plaintiff was given the opportunity to participate in an Employee Assistance Program. When that failed, more personal counseling took place. When her conduct improved, glowing personal evaluations were placed in her record by the very supervisors who had been subjected to plaintiff's vulgarities, racial accusations, and race-based insults. Then, when plaintiff returned to her disruptive ways, she was transferred to a new department for a "fresh start" with a supervisor and coworkers she had not yet alienated. After she was moved to the new line, she again was disruptive, with complaints being voiced by fellow coworkers of different races.

■ Finally, not only can the undersigned find no causal link between plain-

tiff's oppositional activity and her termination, the undisputed record before the court shows that the termination of plaintiff's employment was the direct result of the disruptions she caused in July 1998 and her absolute failure to conform her behavior to the legitimate expectations of her employer or, when called to task, take responsibility for her own actions. Having reviewed plaintiff's 78–page affidavit, the undersigned has found it to contain little more than self-serving, conclusory allegations of discrimination. Speculation and conjecture raise a mere possibility of discrimination rather than the reasonable probability which is necessary to support an inference of discrimination. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–42 (4th Cir.1982). Speculative assertions that a defendant's motivation was unlawful is not enough to withstand summary judgment, *Goldberg v. B. Green and Co.,* 836 F.2d 845, 848 (4th Cir.1988); and conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211 (4th Cir.1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, at 365 (4th Cir.1985).

Plaintiff's allegations of discriminatory animus clearly are speculative and reflect plaintiff's belief that rather than her own actions, it was her race or opposition to racial discrimination that motivated defendant to terminate her employment. Her own affidavit and exhibits, however, only support defendant's argument that she stalked other employees and intimidated other employees by taking notes as to what they did on the job. Indeed, these notes appear as an exhibit to plaintiff's affidavit. For example, plaintiff found it important enough not only to note, but to present to this court, her observation that another employee failed to wear safety-toed shoes to work. Reading that in a light most favorable to plaintiff, perhaps she is attempting to indicate that she was

singled out for discipline when others were not obeying workplace rules. There, however, is no reasonable comparison between an employee who interferes with *other* employees' rights by stalking, threatening violence, and using vulgarities, and one who ignores his *own* personal safety by wearing shoes without a steel toe. *See* Plaintiff's Affidavit.

Finding that plaintiff has failed to establish a causal connection between the first two elements, the undersigned must recommend that defendant's Motion for Summary Judgment be granted, inasmuch as plaintiff has not established a *prima facie* case. Alternatively, if plaintiff could have established a *prima facie* case, the undersigned would recommend that summary judgment be entered against her, inasmuch as defendant has articulated a legitimate, nondiscriminatory reason for her discharge—instigation of interpersonal conflicts with coworkers resulting is repeated disruptions of the workplace.[1]

### RECOMMENDATION

**IT IS, THEREFORE, RESPECTFUL-LY RECOMMENDED** that defendant's Motion for Summary Judgment be **ALLOWED**, and that judgment be **ENTERED** in defendant's favor.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S.

1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendant's Motion for Summary Judgment (# 20).

---

1. Plaintiff has also alleged in her response that she was subjected to age discrimination, but she did not raise that allegation in her administrative complaint or in the complaint filed with this court. Such a claim would not flow naturally from the EEOC's investigation of her Title VII claim of oppositional retaliation. Sloop v. Memorial Mission Hospital, Inc., 198 F.3d 147 (4th Cir.1999). The undersigned would recommend that such an age-based claim is not properly before this court.